UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Beth St. Hilaire,
        Plaintiff

        v.                                    Case No. 10-cv-475-SM
                                              Opinion No. 2012 DNH 084
Morgan Stanley Smith Barney, LLC,
        Defendant

**O R D E R**

Beth St. Hilaire brought suit against her former employer, Morgan Stanley Smith Barney ("MSSB"), alleging that she was subjected to unlawful discrimination and wrongful termination. She says MSSB began discriminating against her after she missed time from work to assist and care for her ailing husband.  Those absences, says plaintiff, prompted employees of MSSB to unjustly criticize her work, refuse to provide her with adequate training and support, and, eventually, terminate her employment - all in violation of the Americans with Disabilities Act ("ADA") and New Hampshire's Law Against Discrimination.

Additionally, plaintiff asserts that because MSSB feared she would eventually invoke her right to take unpaid leave under the Family Medical Leave Act (once that right vested, on the one year anniversary of her hiring), it preemptively (and unlawfully) terminated her employment.  In other words, she says MSSB

anticipatorily retaliated against her to prevent her from acquiring, and then exercising, rights under the FMLA.

MSSB denies that it discriminated against plaintiff, or that it subjected her to a hostile work environment, or that it unlawfully terminated her employment at will.  Instead, says MSSB, it fired St. Hilaire for one reason: her well-documented history of carelessness, inattention to detail, and overall poor job performance.  It moves for summary judgment, asserting that there are no genuinely disputed material facts and it is entitled to judgment as a matter of law.  For the reasons discussed, that motion is granted.

### Standard of Review

When ruling on a motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor."  Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990).  Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported

2

by conflicting evidence." <u>Int'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr.</u>, 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).

Nevertheless, if the non-moving party's "evidence is merely colorable, or is not significantly probative," no genuine dispute as to a material fact has been proved, and "summary judgment may be granted." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50 (1986) (citations omitted).  The key, then, to defeating a properly supported motion for summary judgment is the non-movant's ability to support his or her claims concerning disputed material facts with <u>evidence</u> that conflicts with that proffered by the moving party.  <u>See generally</u> Fed. R. Civ. P. 56(c).  It naturally follows that while a reviewing court must take into account all properly documented facts, it may ignore a party's bald assertions, unsupported conclusions, and mere speculation.  <u>See</u> <u>Serapion v. Martinez</u>, 119 F.3d 982, 987 (1st Cir. 1997).  <u>See also</u> <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

**Background**

I.   <u>Plaintiff's Job Performance</u>.

MSSB hired St. Hilaire as a Registered Client Service Associate ("CSA") in its Portsmouth, New Hampshire office.  In that capacity, she supported three MSSB Financial Advisors by answering the phones, responding to inquiries from their clients, processing paperwork, and updating client accounts.  St. Hilaire was hired by MSSB as an employee at will.  She began work on August 1, 2008.  Her immediate supervisor was Valerie Margaritopoulos, the Operations Manager for the Portsmouth office.  One of the Financial Advisors for whom St. Hilaire provided support - Richard Lyons - was the Branch Manager.

When plaintiff began working at MSSB, she received fairly substantial training.  But, she did not have the benefit of a "desk buddy" (a nearby, more senior employee to provide on-the-job assistance) and, almost immediately, she struggled with at least some aspects of her job.  Ms. Margaritopoulos responded by preparing an "SOS" manual for plaintiff, with specific instructions relating to each of the computer screens she needed to access within MSSB's computer system.  Plaintiff also took online training courses offered by MSSB.  Nevertheless, MSSB financial advisors, as well as their clients, complained about plaintiff's poor performance.  In particular, concerns were

4

voiced about her lack of professionalism when on the phone with clients of the firm, her lack of attention to detail, and her carelessness - performance problems that resulted in errors, like plaintiff placing an improper "market" sell order on behalf of a client, rather than a "limit" order, and incorrectly suggesting to an elderly client that her nearly $2 million account had no money in it (which, perhaps not surprisingly, prompted an anxious and teary phone call from the client to one of the financial advisors). Ms. Margaritopoulos repeatedly discussed those performance issues with plaintiff and explored ways plaintiff could improve. Additionally, other administrators in the office provided St. Hilaire with assistance and further training.

MSSB has documented (with record citations) numerous shortcomings in plaintiff's performance, as well as MSSB's efforts to address them with her, and the court will not chronicle them in detail. See generally Defendant's memorandum (document no. 7) at 3-6. See also Exhibits E through U to St. Hilaire Deposition (document no. 8); Affidavit of Maria Sampogna (document no. 10) ("I have worked for Smith Barney, now MSSB, for more than ten (10) years. During that time, I am not aware of any CSA who received more training and support than Plaintiff did during her employment with MSSB. I am also not aware of any CSA who had as much difficulty learning her duties as Plaintiff.").

It is sufficient to note that the list of mistakes that plaintiff made while employed at MSSB is substantial.  Counsel for MSSB addressed each of those incidents with plaintiff during her deposition and, as to most of them, plaintiff does not deny that they occurred.  See St. Hilaire Deposition at 30-125, and Exhibits E through V.  Plaintiff does, however, offer an explanation or an excuse for nearly all of them, deflecting blame to co-workers, back upon MSSB for having failed to fully and properly train her, upon software shortcomings and computer "glitches," or upon the noisy work environment.  See, e.g., Id. at 63, 71-72, 120-21, 158-59.  See generally Exhibit GG to St. Hilaire deposition.  Plaintiff's mistakes and omissions lead to at least one formal "verbal warning," as well as a written warning, specifically describing the types of errors that she was making and her need to address each of them.  St. Hilaire's mistakes also lead to angry and/or distressed phone calls and e-mails from several MSSB clients to their financial advisors. See, e.g., Exhibits G, J, O, and R to St. Hilaire Deposition.

By the spring of 2009, two of the financial advisors for whom St. Hilaire provided support were becoming increasingly irritated and troubled by her repeated mistakes and her apparent inability to grasp the essential requirements of her job.  Their

frustration is well-illustrated in an e-mail from Richard Lyons

to Ms. Margaritopoulos in May of 2009:

> Val - For the second time in less than a month Beth has
> messed up addresses for one of my largest relationships
> and referral sources, the [] family.  She changed the
> childrens' addresses to their parents' home.  This
> repeated inaccuracy on the part of Ms. Harrison[1] has
> jeopardized a client relationship which I have had for
> over 20 years and represents approximately 7.5 million
> in household assets and countless more referrals over
> the years which total over 20 million in my current
> book of business.  We need to address the carelessness
> on the part of Beth as soon as is possible.  I am
> extremely upset and concerned that she has been on
> warning almost since she started working here and there
> has been little if any improvement in her accuracy
> skills.

Exhibit V to St. Hilaire Deposition.  <u>See also</u> Exhibit S

(Employee Appraisal completed by David Gerasin on March 27, 2009)

(opining that plaintiff needed to make "significant improvement"

in several specified areas; stating that "I have been told by at

least three clients that they are concerned that the follow-

through from my assistant is not there . . . My own step-father,

James [], has mentioned that he is concerned, not necessarily for

his accounts, but for my business;" noting that "Beth is not

result oriented and does not proactively find ways to obtain

results.  She is very much reactive in nature, not a desirable

feature in her position;" and concluding that "Bottom line, I am

---

[1]    While working at MSSB, plaintiff used her maiden name,
Harrison.

increasingly uncomfortable with the situation and have zero confidence at this point."); Exhibit T (Employee Appraisal completed by Richard Lyons) ("I feel that I cannot give work to Beth any longer and trust that it will be done correctly.").[2]

Parenthetically, the court notes that, during her deposition, St. Hilaire admitted that she had no reason to believe that any of the criticisms of her work made by the three financial advisors she supported were related in any way to her use of leave time or her husband's illness.  See St. Hilaire Deposition page 107, lines 3-5; page 115, lines 14-17; page 119, lines 22-23 through page 120, lines 1-2; page 123, lines 22-23 through page 124, line 1-2.  The only employee of MSSB plaintiff believes actually discriminated against her because of her husband's illness was Ms. Margaritopoulos.  See, e.g., Id. at pages 90-91.

_____

[2]     Plaintiff supported three financial advisors at MSSB: Richard Lyons, David Gerasin, and Andrea Landini.  As plaintiff points out, Ms. Landini's comments about plaintiff's job performance were not as critical as those made by Lyons and Gerasin.  But, contrary to plaintiff's suggestion, plaintiff's memorandum at 14, they were far from "almost glowing" endorsements of plaintiff's abilities.  See Exhibit U to St. Hilaire Deposition (Ms. Landini's formal assessment of plaintiff's work).  See also Exhibits F and J (e-mails from Ms. Landini to Ms. Margaritopoulos, critical of plaintiff's job performance).

Although Ms. Margaritopoulos was the operations manager of the Portsmouth office, she lacked the authority to fire plaintiff. <u>See</u> Margaritopoulos Affidavit (document no. 9) at para. 5. But, as noted above, she and at least two of the three financial advisors for whom plaintiff provided support were concerned about plaintiff's job performance. So, shortly after Mr. Lyons sent the e-mail complaining of plaintiff's continued poor performance and expressing his lack of confidence in her abilities, Ms. Margaritopoulos contacted MSSB's human resources department for guidance. She also spoke with her direct supervisor (James Gold), the assistant to the branch manager at another MSSB office (Maria Sampogna), and Mr. Lyons (in his capacity as Branch Manager of the Portsmouth office). According to Ms. Margaritopoulos, those discussions took about a month to complete (in part because a new person joined the human resources team). In the end, a unanimous decision to terminate plaintiff's employment emerged. <u>See</u> Margaritopoulos Affidavit at para. 32. <u>See also</u> Sampogna Affidavit at para. 26. On June 23, 2009, approximately 10 months after she began working at MSSB, St. Hilaire was informed that the company had decided to terminate her employment.

II.  <u>Plaintiff's Absences to Assist her Ailing Husband</u>.

     At the end of October, 2008 (approximately three months into
plaintiff's employment at MSSB), plaintiff's husband was
scheduled for hernia surgery.  Two weeks before that surgery,
plaintiff e-mailed Ms. Margaritopoulos and asked that she be
permitted to take the day off from work.  Ms. Margaritopoulos
granted that request.  On the day of the surgery, St. Hilaire and
her husband learned that he had cancer.  Plaintiff called Ms.
Margaritopoulos to inform her of her husband's diagnosis.  Ms.
Margaritopoulos responded by telling plaintiff to take whatever
time she needed to support her husband and family.  St. Hilaire
Deposition at 87-88, 151.  Plaintiff took the next day off from
work and no one spoke to her about, or criticized her for, her
absences.  <u>Id</u>. at 128-29.  <u>See also</u> Exhibit X.  Plaintiff also
requested leave time on November 4 and 5, and December 2 and 3,
2008.  Each of those requests was granted.  <u>See</u> Exhibits AA, BB
to St. Hilaire Deposition.


     Additionally, plaintiff sought an exception to MSSB's leave
policy and requested permission to carry-over 32 hours
(approximately four days) of vacation/leave time from 2008 to
2009, so she might accompany her husband to New York for
treatment.  Exhibit DD to St. Hilaire Deposition.  Although MSSB
has a policy against permitting employees to carry-over unused

paid leave time from year to year (a so-called "use it or lose
it" policy), Ms. Margaritopoulos secured authorization from Mr.
Gold for plaintiff to do so.  Then, between January 28 and
February 6, 2009, plaintiff requested and was permitted to miss
work for eight days.  It appears that she was paid for all eight
of those days, even though she had only carried-over four earned
days of vacation time from the prior year.  St. Hilaire
Deposition at 141.  Plaintiff was not criticized or reprimanded
in any way for having taken that time off.  Id. at 137.  In fact,
plaintiff testified that she was never denied permission to take
off time so she might assist her husband; each such request was
granted, and no MSSB employee ever spoke to her or reprimanded
her in any way for having taken that time from work.  St. Hilaire
Deposition at 131-32, 137, 145-46.

     Because employees become entitled to FMLA leave only after
completing one year of work, plaintiff did not qualify for FMLA
leave during her tenure at MSSB.  See 29 U.S.C. § 2611(2)(A).
Not surprisingly, then, plaintiff testified that she was never a
party to, nor did she initiate, any discussions about FMLA leave;
she never asked MSSB about her FMLA rights; she never suggested
that she intended to invoke her FMLA rights once she qualified
for them; and she never specifically invoked her (inchoate)
rights under the FMLA.  St. Hilaire Deposition at 149-50.

11

Nevertheless, she claims MSSB discriminated against her (and
eventually terminated her employment) because it had reason to
believe she would avail herself of FMLA leave in the future.


III. Evidence of Discrimination.

On November 7, 2008 (slightly more than three months after
she began working at MSSB, and about two weeks after plaintiff
learned of her husband's cancer), plaintiff met with Ms.
Margaritopoulos and a representative from MSSB's human resources
department to discuss plaintiff's poor job performance.
Plaintiff was given a formal verbal warning, and told that her
performance would be evaluated over the next 30 days, "with a
requirement of vast improvement."  Exhibit K to St. Hilaire
Deposition.  Plaintiff describes that meeting as follows:

> VM [Ms. Margaritopoulos] informed plaintiff she did not
> believe plaintiff had what it took to do her job.  This
> was the first time MSC [Ms. Sampogna] and plaintiff
> were in the office since 10/27/08, the date plaintiff
> notified VM of her husband's cancer.  VM informed
> plaintiff that regardless of what was going on in
> plaintiff's personal life, she had to be depended upon
> and was expected to be at work.  This was a
> complete turn around from what VM previously said to plaintiff,
> which was to take all of the time she needed.

Plaintiff's memorandum (document no. 17-1) at 5.  See also
Hilaire Deposition at 151-52 ("Well, at first when I told [Ms.
Margaritopoulos] about [my husband's illness], she said to take
all the time off I needed.  And then when we had the verbal

12

warning, she said that it must be difficult for me but that she needed me at work, and she asked if I planned to take any time off for it and said that if I did, she would find a replacement.").

Ms. Margaritopoulos denies having made any such statement. "At no time during this conversation, or at any other time, did I use the word 'replace' or 'replacement' in terms of ensuring coverage of Plaintiff's duties.  My only concern was to ensure that the office had sufficient office coverage by arranging for back up staffing during any period of time that Plaintiff would need to take off from work."  Margaritopoulos Affidavit at para. 37.  But, for purposes of ruling on MSSB's motion for summary judgment, the court will construe that genuinely disputed material fact in favor of the plaintiff and assume that Ms. Margaritopoulos did, in fact, make the statement about finding a replacement for plaintiff.

That alleged statement is the core of plaintiff's discrimination claims.  It is the primary piece of evidence to which she (repeatedly) points in support of her claim that she was the victim of unlawful discrimination.  According to plaintiff, Ms. Margaritopoulos' statement about finding a replacement reasonably implied that if plaintiff took any more

13

leave time to assist her husband, her employment would be
terminated.  St. Hilaire Deposition at 92, 152.


But, as discussed above, plaintiff had a well-documented
history of poor job performance that pre-dated her disclosure to
MSSB of her husband's illness.  See Exhibits E, F, G, H, I, and J
to St. Hilaire Deposition.  Moreover, her employment was not
terminated for another seven months after the allegedly
discriminatory statement.  And, during those subsequent seven
months two things happened.  First, Ms. Margaritopoulos received
numerous complaints about plaintiff's poor job performance -
complaints plaintiff acknowledges were not related in any way to
either her husband's illness or her having to take time off from
work to assist him.  Second, plaintiff was repeatedly allowed to
take leave time to assist her ailing husband - not a single
request for leave time was denied.  And, her request to carry
forward unused leave time from 2008 to 2009 was granted, despite
the fact that MSSB has a policy against allowing employees to
carry forward unused leave time.


Beyond the "replacement" statement allegedly made by Ms.
Margaritopoulos on November 7, 2008, plaintiff relies entirely
upon inference and supposition in support of her claims that she

was the victim of unlawful discrimination.  For example, in her

deposition, plaintiff testified as follows:

> Question: Prior to your termination, did you ever
> request or inquire as to FMLA benefits from
> Morgan Stanley Smith Barney?
>
> Answer:   No.
>
> Question: Did you in any way ever suggest that you
> intended to take FMLA time when you were
> eligible?
>
> Answer:   No.
>
> Question: What makes you believe that Morgan Stanley
> Smith Barney terminated you then to keep you
> from using FMLA?
>
> Answer:   Because it was likely that I was going to be
> using it.
>
> Question: How did they know that?
>
> Answer:   Because they knew the condition of my husband
> and they knew about FMLA.

St. Hilaire Deposition at 149-50.  Plaintiff summarizes her

claims and the evidence supporting them as follows:

> When Plaintiff gave notice of her husband's 3rd surgery
> for July 2009, she did not specify the beginning or end
> of July because she did not know.  The dates <u>could have</u>
> <u>run into August</u> [i.e., when she would be eligible for
> FMLA leave], as of the time the employer decided to
> terminate.  This, together with Defendant's admission
> that it knew Plaintiff would soon be qualified for FMLA
> leave (08/01/09), was <u>the motivating factor for her</u>
> <u>termination</u>.  Given the seriousness of [her husband's]
> illness (Mesothelioma) and the ongoing need for
> treatment, <u>Defendant could well anticipate the need for</u>
> <u>future FMLA leave</u>, up to 12 weeks per year.  This
> together with the comment [by Ms. Margaritopoulos] in

15

November 2008, and the discipline shortly after each
surgery or notice thereof, should entitle Plaintiff to
reach the jury for a determination on the disputed
material facts and existence of pretext.

Plaintiff's Sur-reply Memorandum (document no. 27) at 5 (emphasis

supplied).


**Discussion**

I.   Workplace Discrimination

In counts one and two of her complaint, plaintiff asserts

that, in violation of the Americans with Disabilities Act (count

one) and New Hampshire's Law Against Discrimination (count two),

employees of MSSB unfairly criticized her work and, ultimately,

terminated her employment "on the basis of her association with a

person who was disabled or perceived to be disabled."   Complaint

(document no. 3) at para. 34.   See also Id. at para. 28.   She

says such wrongful conduct caused her to suffer stress, anxiety,

and emotional distress.   The parties agree that plaintiff's ADA

claim and her state law discrimination claim are governed by

essentially the same standards.


The "association provision" of the Americans with

Disabilities Act protects "qualified individuals from employment

discrimination based on the 'known disability of an individual

with whom the qualified individual is known to have a

relationship or association.'" <u>Oliveras-Sifre v. Puerto Rico Dep't of Health</u>, 214 F.3d 23, 26 (1st Cir. 2000) (quoting 42 U.S.C. § 12112(b)(4)). <u>See also</u> 29 C.F.R. Pt. 1630.8 (May 24, 2011) (giving three examples of prohibited discrimination based upon association). She may prove her case by presenting direct evidence of discrimination or she may prove it indirectly by using the prima facie case and burden shifting methods established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, (1973). <u>See</u> <u>Barker v. Int'l Paper Co.</u>, 993 F. Supp. 10, 15 (D. Me. 1998) (citing <u>Jacques v. Clean-Up Group, Inc.</u>, 96 F.3d 506, 511 (1st Cir. 1996)).

Because plaintiff has presented no direct evidence of discrimination against her as a result of her husband's illness and her anticipated invocation of FMLA rights, the court applies the burden-shifting analysis. To establish a prima facie case under the ADA's associational anti-discrimination provision, plaintiff must prove by a preponderance of the evidence that: (1) she was subjected to an adverse employment action; (2) she was qualified for her job at the time of the adverse employment action; (3) at the time of the adverse employment action, MSSB knew she had a relative or associate with a disability; and (4) the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the

relative or associate was a determining factor in MSSB's decision.  See, e.g., Barker, 993 F. Supp. at 14.  See also Den Hartog v. Wasatch Academy, 129 F.3d 1076, 1085 (10th Cir. 1997).

    For purposes of summary judgment, MSSB does not dispute that plaintiff can make out the essential elements of a prima facie claim of associational discrimination.  Accordingly, it bears the burden "to articulate some legitimate, nondiscriminatory reason for the employee's [termination]," sufficient to raise a genuine issue of fact as to whether it discriminated against her.  If MSSB offers such a reason for plaintiff's termination, "the burden shifts back to [plaintiff], and [she] must proffer evidence to establish that [MSSB's] non-discriminatory justification is mere pretext, cloaking discriminatory animus. The ultimate burden of proving unlawful discrimination rests at all times with [plaintiff]."  Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 105 (1st Cir. 2005) (citations and internal punctuation omitted).  See generally Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000).

    MSSB has borne its burden of production.  That is to say, it has articulated a plausible, non-discriminatory reason for its decision to terminate plaintiff's employment: her ongoing inability to perform her job to the satisfaction of at least two

of the three financial advisors she supported (as evidenced by
the performance evaluations submitted by Mr. Gerasin and Mr.
Lyons, followed soon thereafter by the e-mail from Mr. Lyons).
The burden then, reverts to plaintiff, who must point to
sufficient evidence to warrant the conclusion that MSSB's
proffered explanation is merely a pretext and that the real
reason her employment was terminated was her association with her
ailing husband.  She has failed to carry that burden.

    In support of her claims, plaintiff points to three things
she says demonstrate that there was a direct causal connection
between her discharge and her relationship with her ailing
husband: first, Ms. Margaritopoulos's alleged statement about
finding a "replacement" if plaintiff planned to take additional
time off to assist her husband; second, the temporal proximity
between various disciplinary events and days she missed work to
assist her husband; and, finally, that MSSB treated other
employees who were not engaged in protected activity more
leniently than it treated her.  But, none of those three
contentions holds up to even modest scrutiny.

    That plaintiff was never denied requested leave, was
afforded more leave than she had accrued in January of 2009
(specifically because she had to care for her ailing husband),

and was never admonished for any of her absences, substantially undermines the persuasive value of Ms. Margaritopoulos's alleged "replacement" statement. So, too, does the fact that it occurred more than seven months <u>before</u> plaintiff's discharge. <u>See, e.g.</u>, <u>Clark County Sch. Dist. v. Breeden</u>, 532 U.S. 268, 273 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'") (citations omitted). <u>See also</u> <u>Gonzalez-Droz v. Gonzalez-Colon</u>, 660 F.3d 1, 17 (1st Cir. 2011) (one year between protected conduct and alleged retaliation insufficiently close to raise an inference of discrimination); <u>Moron-Barradas v. Dep't of Educ. of Com. of Puerto Rico</u>, 488 F.3d 472, 481 (1st Cir. 2007) (holding that a lapse of eight months between protected conduct and alleged discrimination is "insufficient to establish temporal proximity"); <u>Calero-Cerezo v. U.S. Dep't of Justice,</u> 355 F.3d 6, 25 (1st Cir. 2004) (noting that "three and four month periods have been held insufficient to establish a causal connection based on temporal proximity").

But, says plaintiff, there <u>was</u> temporal proximity between various times she was disciplined (or admonished) and times she took off from work to assist her husband. She does not, however,

specifically identify which instances of discipline she believes were prompted by, and closely followed, her use of leave time. Nevertheless, under the circumstances presented in this case, even if she did receive some form of criticism or discipline arising out of her job performance around the time she was absent from work to assist her husband, such evidence is neither terribly surprising nor helpful to her.  Plaintiff only worked for MSSB for ten months.  During that time, she requested, and was granted, leave time on October 27 and 28, November 4 and 5, and December 2 and 3, 2008.  And, between January 28 and February 6, 2009, plaintiff requested and was permitted to use an additional eight days of accrued paid time off.  Also during that time, Ms. Margaritopoulos spoke to plaintiff about her job performance (and ways to improve it) or received input from other MSSB employees critical of plaintiff's performance at least a dozen times.  Consequently, that one or more of those events occurred shortly before or shortly after plaintiff took time off from work is not particularly compelling inferential evidence of discrimination based on absence from work.

Finally, plaintiff asserts that she has pointed to evidence demonstrating that MSSB treated other (less capable) employees more favorably than it treated her, thus evidencing a discriminatory animus on the part of MSSB.

21

> Plaintiff may demonstrate pretext by showing the
> employer meted out more lenient treatment to similarly
> situated employees not engaged in protected activity.
> PM, p. 17.  At least one prior CSA may be compared.  AL
> [Andrea Landini] discussed the other CSA's performance
> as unsatisfactory, with attached feedback form, and she
> believes said employee was not discharged.  Ex. 7, par.
> 7, Ex. B.  See also, Ex. 8, Aff. of counsel, which
> attached 8-A and 8-B, which are reviews of the same
> CSA, by Mr. Jenks, and VM, which clearly indicate her
> performance was below par, and below Plaintiff's.

Plaintiff's Sur-reply (document no. 27) at 2.  Importantly,

however, all that can be gleaned from the evidence submitted by

plaintiff is that the other Client Service Associate was employed

by MSSB before plaintiff began working for MSSB, she received

unsatisfactory performance reviews, and the financial advisor

referenced in plaintiff's papers (Ms. Landini) believes, "to the

best of [her] knowledge" that the woman "eventually resigned."

Affidavit of Andrea Landini (document no. 27-1) at para. 7.  It

is entirely unclear how MSSB responded to that employee's poor

job performance or the circumstances under which she left the

employ of MSSB (she may, for example, have been permitted to

resign, rather than be fired).  It is, however, plain that, based

upon this sparse record, a trier-of-fact could not reasonably

conclude that MSSB treated that other employee more favorably

than it treated plaintiff.

In short, even viewing the record in the light most favorable to plaintiff, the evidence suggesting that she was the victim of unlawful discrimination based upon her association with her ailing husband is fatally weak. Evidence that MSSB terminated her employment based upon her poor job performance, however, is compelling. First, plaintiff cannot deny the highly critical performance reviews submitted by two of the three financial advisors she supported (the third review was, at best, neutral). Nor can she deny that one of those financial advisors - Mr. Gerasin - wrote that he had "zero confidence [in plaintiff] at this point," Exhibit S to St. Hilaire Deposition, or that the other - Mr. Lyons - wrote "I feel that I cannot give work to Beth any longer and trust that it will be done correctly." Exhibit T. And, as plaintiff conceded at her deposition, those highly negative comments and performance reviews were entirely unrelated to her relationship to her husband. <u>See</u> St. Hilaire Deposition page 107, lines 3-5; page 115, lines 14-17; page 119, lines 22-23 through page 120, lines 1-2; page 123, lines 22-23 through page 124, line 1-2.

Moreover, the only person plaintiff says actually harbored ill feelings toward her based upon her use of leave time - Ms. Margaritopoulos - lacked the authority to fire her. That decision was made by a committee of MSSB employees, including one

of the financial advisors for whom plaintiff provided support.
And, as noted above, each time plaintiff asked for leave time,
Ms. Margaritopoulos granted her request without question (and
even obtained permission to allow plaintiff to carry over unused
leave time from one year to the next) - hardly behavior
indicative of a discriminatory intent.

Construing all plausible inferences in favor of plaintiff,
the court cannot conclude that a rational, properly instructed
jury could plausibly find that MSSB discriminated against her
based upon her association with her ailing husband.  MSSB is,
then, entitled to summary judgment as to counts one and two of
plaintiff's complaint.

II.  <u>Preemptive Retaliation under the FMLA</u>.

In count three of her complaint, St. Hilaire asserts that
MSSB terminated her employment as a form of preemptive
"retaliation for Plaintiff's husband's illness and Plaintiff's
impending qualification for FMLA leave, which the employer
anticipated she would use to help with her husband's illness."
Complaint at para. 38.  For purposes of addressing MSSB's motion
for summary judgment, the court will assume, without deciding,
that such a claim is cognizable in this circuit.

"The FMLA contains two distinct types of provisions: those establishing substantive rights and those providing protection for the exercise of those rights." Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 330 (1st Cir. 2005). Among the substantive rights established by the FMLA is the right of an "eligible employee" to take up to twelve weeks of unpaid leave each year in order to care for a spouse who suffers from a serious health condition. 29 U.S.C. § 2612(a)(1)(C). Subject to exceptions the parties agree do not apply in this case, an "eligible employee" is one who has been employed for at least 12 months, for at least 1250 hours of service during the previous 12-month period. 29 U.S.C. § 2611(2).

It is beyond dispute that plaintiff was not an "eligible employee" of MSSB when her employment was terminated after approximately ten and one-half months. And, the FMLA permits only "eligible employees" to bring civil actions against their employers for violations of the FMLA. 29 U.S.C. § 2617(a)(1) ("Any employer who violates section 2615 of this title shall be liable to any eligible employee affected" for damages and/or equitable relief) (emphasis supplied). Nevertheless, St. Hilaire asserts that she has a viable retaliation claim under the FMLA.

In support of her claim, plaintiff relies upon a series of cases that, generally speaking, stands for the following proposition: "an employee may bring a retaliation claim under FMLA if the employee was terminated prior to becoming eligible for FMLA leave, but the employee <u>declared an intention</u> to take leave more than one year after employment commenced."  <u>Gleaton v. Monumental Life Ins. Co.</u>, 719 F. Supp. 2d 623, 629 (D.S.C. 2010) (emphasis supplied).  As the district court for the Northern District of Illinois observed:

> [T]he FMLA also clearly contemplates the scenario in which an employee requests leave beginning on a foreseeable future date:
>
>> In any case in which the necessity for leave under subparagraph (A) or (B) of subsection (a)(1) of this section is foreseeable based on an expected birth or placement, <u>the employee</u> shall provide the employer with not less than 30 days' notice, before the date the leave is to begin, of the employee's intention to take leave.
>
> 29 U.S.C. § 2612(e)(1) (emphasis added).  It is clear from the text and context of the notice clause, that Congress intended to help and protect employers by insuring adequate notice of extended absences by employees.  It would be illogical to interpret the notice requirement in a way that requires employees to disclose requests for leave which would, in turn, expose them to retaliation, or interference, for which they have no remedy.  If employers were not bound by the FMLA before the employee is eligible, then the employee should not be required to give the employer any notice.  Logic requires that the FMLA be read to require that that employee be permitted to make a charge against the employer for an adverse employment action.

<u>Reynolds v. Inter-Industry Conference on Auto Collision Repair</u>,
594 F. Supp. 2d 925, 928-29 (N.D. Ill. 2009).

Even assuming that those decisions accurately interpret the
anti-discrimination provisions of the FMLA, they do not assist
plaintiff in this case.  First, as she conceded in her
deposition, St. Hilaire never requested FMLA leave time nor did
she ever inform MSSB that she intended to take FMLA leave time
once she became eligible for it.  St. Hilaire Deposition, at 149-
50.  <u>See generally</u> <u>Gleaton</u>, 719 F. Supp. 2d at 629 (providing, as
a pre-condition to suit, that the employee must have declared an
intention to use FMLA leave in the future).  And, even if she had
expressed an intention to use FMLA leave and accompany her
husband to his second surgery, that surgery occurred in mid-July
of 2009 - weeks before St. Hilaire would have even become
eligible for FMLA leave.  Finally, and perhaps most
significantly, for the reasons discussed above, a properly
instructed jury could not, on this record, reasonably conclude
that MSSB terminated plaintiff for any reason other than her
documented poor job performance.

MSSB is, then, entitled to summary judgment as to count
three of plaintiff's complaint.

III. <u>Wrongful Termination</u>.

Finally, in count four of her complaint, plaintiff alleges that she was the victim of wrongful discharge, in violation of New Hampshire's common law.  To state a viable common law claim for wrongful discharge, a plaintiff must allege two things:

> one, that the employer terminated the employment out of bad faith, malice, or retaliation; and two, that the employer terminated the employment <u>because the employee performed acts which public policy would encourage</u> or because he refused to perform acts which public policy would condemn.

<u>Short v. Sch. Admin. Unit No. 16</u>, 136 N.H. 76, 84 (1992) (citing <u>Cloutier v. Great Atl. & Pac. Tea Co.</u>, 121 N.H. 915, 921-22 (1981)) (emphasis supplied).  <u>See also</u> <u>Monge v. Beebe Rubber Co.</u>, 114 N.H. 130 (1974).


With respect to the second essential element of St. Hilaire's claim, plaintiff asserts that MSSB terminated her employment because she was engaged in conduct which public policy would encourage: using her accumulated leave time (and, eventually, her FMLA leave time) to tend to her ailing husband. Even if plaintiff has correctly characterized New Hampshire public policy - an issue the court need not address - she cannot avoid the fact that this record does not support the conclusion that MSSB terminated her employment because she used leave time, and would have used FMLA leave, to care for her ill husband, or

28

that MSSB acted "out of bad faith, malice, or retaliation."

<u>Short</u>, 136 N.H. at 84.


### Conclusion

For the foregoing reasons, as well as those set forth in defendant's memoranda (documents no. 7 and 21), the court concludes that MSSB is entitled to judgment as a matter of law as to each of the four counts set forth in plaintiff's complaint. According, its motion for summary judgment (document no. 7) is granted.  The Clerk of Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

May 11, 2012

cc:  Leslie H. Johnson, Esq.
     A. Robert Ruesch, Esq.
     Richard G. Moon, Esq.